**IN THE UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF MARYLAND**

|  |  |  |
|---|---|---|
| | **:** | |
| VIRGINIA POWER ENERGY | **:** | |
| MARKETING, INC., | **:** | |
| | **:** | Civil No. CCB-05-2751 |
| v. | **:** | |
| | **:** | |
| INTEROCEAN COAL SALES, LDC | | |

and

DRUMMOND COAL SALES, INC.

### MEMORANDUM

Plaintiff Virginia Power Energy Marketing, Inc.("VPEM") claims damages from defendants Interocean Coal Sales LDC ("Interocean") and Drummond Coal Sales, Inc. ("Drummond") (the alleged guarantor of Interocean) in a dispute over shipments of coal. Currently pending before the court is plaintiff's motion for partial summary judgment as to the defendants' liability.  Also pending before the court is the defendants' motion for partial summary judgment as to whether plaintiff can properly seek cover damages.  The issues have been fully briefed and were argued in a motions hearing on December 19, 2006.  For the reasons stated below, both the plaintiff's and the defendants' motions will be denied.

### I.  Background

At issue are two Coal Purchase Agreements entered into between USGen New England, Inc. ("USGen") and defendant Interocean - the first dated January 1, 2004 for the sale and

1

delivery of coal in the calendar year 2004, and the second dated August 12, 2004 for the sale and delivery of coal from 2005-2009.  As of January 1, 2005, plaintiff VPEM, which is in the business of procuring coal for power plants, is the successor-in-interest to USGen for these agreements.

The 2004 Agreement provided for the purchase by USGen of coal in two "Tranches," or sections.  Tranche I required the sale and delivery by Interocean of a certain amount of coal in pro rata shipments throughout the 2004 calendar year.[1]  (Am. Compl. at Ex. A.)  Tranche II required the delivery of a quantity of coal in shipments between May and August 2004.  Under the "Contract Quantity" section of the contract, Tranche I provided for a certain amount of coal to be shipped, "+/- 10% shipping tolerance to be shipped during January-December 2004," and Tranche II provided "+/- 10% shipping tolerance to be shipped during May-August 2004."  The 2005-2009 Agreement similarly provided for a shipment of a certain amount of coal per year "+/- 10% shipping tolerance."  (Am. Compl. at Ex. B.)  The phrase is not further defined in the contract.

The 2004 and 2005-2009 Agreements were not the first coal shipping agreements between the two parties.  A 2002 coal purchase Agreement contained a "+/- 10%, Buyer's Option in shipments" clause and no "+/- 10% shipping tolerance" clause.  (Def.'s Opp. Mem. at Ex. 3.)  A 2003 coal purchase Agreement shifted course and contained the "+/- 10% shipping tolerance" clause found in the 2004 and 2005-2009 Agreements.  (*Id.* at Ex. 5.)  In performing that 2003 Agreement, Interocean delivered almost exactly the numerical tonnage amount of coal

---

[1]The amount of coal required to be shipped has been redacted throughout the briefs and record.

stated in the Agreement.  (Pl.'s Mem. at Ex. C., Walker Declaration at ¶ 6.)

Sometime in 2004, the price of coal rose past the price provided for in the 2004 Agreement.  As a result, Interocean apparently took a second look at the 2004 Agreement, decided that "+/- 10% shipping tolerance" referred to the total amount of coal Interocean was obligated to ship, and deduced that the Agreement allowed it to ship 90% of the coal specified in the contract.  In a January 2005 email, Interocean first told VPEM that it had the right to sell 90% of the specified coal in Tranche I of the 2004 Agreement.  (Am. Compl. at Ex. D.)  At this point, Tranche II of the 2004 Agreement had already been filled to the specified level.  Months later, Interocean confirmed that it would take the same position for the 2005-2009 Agreement and deliver 90 percent of the specified quantity amount.  (*Id*. at Ex. E.)

VPEM contends that in order to make up for the shortfall, it sought cover.  Four spot transactions were made by VPEM in 2005, which covered the shortfall under the 2004 Agreement.  (Pl.'s Mem. at Ex. A, Haislip Dep. at Exs. 13-16.)  VPEM notes that the prices paid in the cover transactions were higher than the price contained in the Agreement, but claims that it attempted to buy the coal at the lowest price possible.

In late 2005, Interocean filed a motion for judgment on the pleadings arguing that the phrase "+/- 10% shipping tolerance" was unambiguous and that it clearly meant Interocean had the right to ship 90% of the specified coal in the contract.  I found the phrase ambiguous and denied the defendants' motion, stating that although the "plus or minus shipping tolerance, appears right next to the overall ... ton phrase in contract quantity" making Interocean's argument plausible, it is also "reasonable to think that shipping tolerance can refer to each individual shipment and what happens when each ship is loaded and the weighing is done..."

(*Virginia Power Energy Marketing, Inc. v. Interocean Coal Sales*, Transcript of Motion for

Summary Judgment, Feb. 3, 2006 at 28-29.)

After discovery, VPEM filed a motion for summary judgment as to the defendants'

liability.  VPEM argued that the understanding of the drafters of the Agreements, the parties'

course of dealing and past performance, and industry meaning and trade usage all support

VPEM's contention that the "+/- 10% shipping tolerance" referred to individual shipments and

not to the total quantity necessary to ship.  The defendants moved for partial summary judgment

in relation to VPEM's claimed cover damages under the 2004 Agreement.

For reasons that follow, I will deny both motions for summary judgment.  While VPEM's

interpretation of the contract may be more plausible than the defendants', the defendants have

provided enough evidence to raise a dispute of material fact as to the meaning of the key "+/-

10% shipping tolerance" phrase.  Similarly, on the record before me, there are genuine issues of

material fact as to the issue of cover damages.

Rule 56(c) of the Federal Rules of Civil Procedure provides that summary judgment:

> shall be rendered forthwith if the pleadings, depositions, answers to interrogatories, and
> admissions on file, together with the affidavits, if any, show that there is no genuine issue
> as to any material fact and that the moving party is entitled to a judgment as a matter of
> law.

The Supreme Court has clarified this does not mean that any factual dispute will defeat the

motion:

> By its very terms, this standard provides that the mere existence of *some* alleged
> factual dispute between the parties will not defeat an otherwise properly
> supported motion for summary judgment; the requirement is that there be no
> *genuine* issue of *material* fact.

*Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 247-48 (1986) (emphasis in original).

"The party opposing a properly supported motion for summary judgment 'may not rest upon the mere allegations or denials of [his] pleadings,' but rather must 'set forth specific facts showing that there is a genuine issue for trial.'"  *Bouchat v. Baltimore Ravens Football Club, Inc.*, 346 F.3d 514, 525 (4th Cir. 2003) (alteration in original) (quoting Fed. R. Civ. P. 56(e)). The court must "view the evidence in the light most favorable to . . . the nonmovant, and draw all reasonable inferences in her favor without weighing the evidence or assessing the witness' credibility," *Dennis v. Columbia Colleton Med. Ctr., Inc.*, 290 F.3d 639, 644-45 (4th Cir. 2002), but the court also must abide by the "affirmative obligation of the trial judge to prevent factually unsupported claims and defenses from proceeding to trial."  *Bouchat*, 346 F.3d at 526 (internal quotation marks omitted) (quoting *Drewitt v. Pratt*, 999 F.2d 774, 778-79 (4th Cir. 1993), and citing *Celotex Corp. v. Catrett*, 477 U.S. 317, 323-24 (1986)).

## II.  Plaintiff's Motion for Partial Summary Judgment

In considering a motion for summary judgment on a matter of contract interpretation, a court must first determine whether the contract is unambiguous on its face.  *Goodman v. Resolution Trust Corp.*, 7 F.3d 1123, 1126 (4th Cir.1993).  If the contract is unambiguous, the court should interpret the contract as a matter of law.  *Id.*  If the contract is ambiguous, however, the court may not grant summary judgment unless there is dispositive extrinsic evidence incorporated in the summary judgment materials.  *Id.*  A contractual provision is ambiguous if it is "susceptible of two reasonable interpretations".  *Id.* (quoting *American Fid. & Cas. Co. v. London & Edinburgh Ins. Co.*, 354 F.2d 214, 216 (4th Cir. 1965)).

Courts have allowed a wide variety of extrinsic evidence to aid in the interpretation of

contracts, including the structure of the contract, the parties' relative positions and bargaining power, the history of negotiations, whether one party prepared the instrument, and the conduct of the parties.  *See, e.g., Miller v. Bristol-Myers Squibb Co.*, 121 F. Supp. 2d 831, 840 (D. Md. 2000).   Here, the parties have provided information regarding the plain meaning of the contract, the intent of the drafters of the agreement, the parties' past performance and course of dealing, and experts' testimony on trade usage.  Each will be examined in turn.

A.  Plain Language

The 2004 and 2005-2009 Agreements require Interocean to sell a specified tonnage "+/- 10% shipping tolerance."  VPEM argues that if the Agreements allowed the defendants to sell between 90 and 110% of the stated contract quantity, they would have read either "[X tons of coal] +/- 10%" or "[X] +/- 10% at Seller's option, or "[X] +/- quantity tolerance."  (Pl.'s Mem. at 9.)  The contract said none of these things.  Instead, the "+/- 10%" preceded "shipping tolerance," and VPEM contends the word "shipping" must be given some effect, arguing that because the Agreements contemplate multiple shipments of coal (either pro rata or "approximately equal distribution"), it makes sense for the +/- 10% shipping tolerance to refer to individual shipments of coal, and that shipping tolerance allows for different loading conditions and vessel capabilities.  (*Id.* at 11.)

While VPEM's arguments are somewhat persuasive, the structure of the contract raises the question why, if the +/- 10% shipping tolerance refers to individual shipments, it was not placed in the section of the Agreements detailing how and when individual shipments were to be delivered.  Instead, it was placed in the section that detailed the total quantity to be shipped under the contract.  Further, if the +/- 10% does not refer to the quantity provision, the contract

does not specify when the contract is fulfilled, given that the parties agree, as discussed below, that the nature of coal shipments makes it virtually impossible to ship the exact amount of coal specified in the contract.  As I ruled in connection with the defendants' motion for judgment, the plain meaning of the term is susceptible of more than one reasonable interpretation, leading me to examine extrinsic evidence relating to the contract.

B.  Intent of the Drafters

In attempting to explain the meaning of "shipping tolerance," VPEM deposed the drafters of the 2004 and 2005-2009 Agreements, as well as the drafter of previous agreements between the parties.

1.  Ken James

Ken James, according to VPEM, was the principal drafter of the 2004 and 2005-2009 Agreements for the defendants.[2]  (Pl.'s Mem. at Ex. D, James Dep. at 12.)  In drafting the contract, James remembers culling the +/-10% shipping tolerance language from other Interocean documents.  VPEM highlights several statements that seem to indicate James agrees with the plaintiff's position.  For instance, James noted that Interocean was obligated under the 2004 and 2005-2009 Agreements to deliver the specified amount of coal.  (*Id.* at 57, 67.)  He also understood that the shipping tolerance could not be unilaterally invoked by one party or the other.  (*Id.* at 91.)

James,  however, did not seem to have an entirely consistent understanding of the

---

[2] The defendants take issue with the contention that James was the primary drafter for the defendants, and claim that "[James'] role was limited to negotiating basic terms in a term sheet that contained deal-specific information ultimately inserted in a standard form contract."  (Def.'s Opp. Mem. at 17.)

meaning of the crucial +/- 10% shipping tolerance phrase.  For instance, he testified:

> Q: Was it your understanding that the plus or minus ten percent shipping tolerance in the agreement could simply be applied to that total contract amount, to vary it by [XXX] tons plus or minus?
> A: If you added up all the vessels, and throughout that year, you could be at XXX tons, or you could be a total of ten percent over that or ten percent under that based upon the vessels that you loaded for the year.
> Q: Based upon each individual shipment tolerance for the vessel?
> A: Yes.
> Q: Did you have an understanding that this plus or minus ten percent shipping tolerance phrase could be applied to the contract quantity based on changes in the market price for coal?
> A: No.

(*Id*. at 89-90.)  Thus, James seems to testify that Interocean could have satisfied its obligation by shipping 90% of the specified amount, but also stated that the tolerance provision could not be applied based on changes in market price.

### 2.  Tom Netzel

Tom Netzel was the principal negotiator of the Agreements for USGen.  Netzel testified that the three main issues in the negotiations with Ken James were the volume, price, and quality of the coal.  Netzel's understanding of the quantity provision was captured in this exchange:

> Q: With regard to the contract quantities in Exhibit 3, do you recall if there were ever any issues as to whether the correct quantities had been shipped?
> A: I don't remember.  But the way these contracts are designed is plus or minus XXX shipping tolerance.  It is designed to be a plus or minus ship so that you can – you want to get around XXX tons, for instance, on Tranche 1. ... If you're short because you didn't have a ship that's XXX tons, then you would be allowed to bring in a XXX on ship to bring in the rest of that coal. ... So the idea is that you're not going to hit exactly XXX. We try to come as close as possible, plus or minus a ship.  So you try to get a ship in there that overlaps the exact amount –.

(Pl.'s Mem. at Ex. F, Netzel Dep. at 44-45.)  In Netzel's view, "the idea of these contracts is that you get as close to the XXX as you can, not to be real distant from that by very much."  (*Id.* at

48.)  The +/- 10% referred to "the size of the ships and a shipping tolerance."

### 3.  Harry Papadopoulos

Harry Papadopoulos is a former Director of coal trading for PG&E, which is the parent company of USGen and VPEM.  One of Papadopoulos' responsibilities for PG&E was negotiating the acquisition of coal from the defendants.  Papadopoulos negotiated two agreements for the 2002 and 2003 calendar years.  The 2003 coal purchase agreement included the phrase "+/- 10% shipping tolerance."

Papadopoulos's view on the meaning of "shipping tolerance" is different from Netzel's and James's.  Papadopoulos testified:

> Q: If you don't mind doing a little math, could you tell me the total tonnage of coal to be delivered under that agreement and your understanding in all of the tranches?
> A: XXX tons.  Firm.
> Q: And your testimony is that +/- 10% functions as a buyer's option on that XXX quantity?
> A: No, sir.
> Q: Can you explain what the +/- 10% means then?
> A: It means that the buyer, the shipper, has the right to take +/- 10% at his option.
> Q: On each shipment?
> A: On the tons.
> Q: Well in your understanding as a negotiator of this agreement, what do the two words "shipping tolerance" mean in that phrase?
> A: That you have the right to ship.  The buyer has the right to ship 10% more or less of that base volume.  The shipper is the buyer.  The shipper is not the seller.  The shipper is the buyer.

(Pl.'s Mem. at Ex. G, Papadopoulos Dep. at 82-83.)  Papadopoulos also testified that he explained his view of the clause to George Wilbanks, the Interocean negotiatior, in the negotiations over the contract; Papadopoulos stated that the buyer has the 10% option because "when he books the freight, the owner, the ship owner has the +/- 10% options.  So you have to get matched up to make sure that you're not sitting there with a ship owner who's asking for more coal, because the

way the ships get scheduled or nominated versus you, who don't want to give them.  So it's, like,

I've got +/- 10%.  The owner gets +/- 10%." (*Id.* at 54.)

### 4.  George Wilbanks

George Wilbanks helped negotiate the 2003 and 2004 Agreement on behalf of Interocean

with Papadopoulos.  He, too, has a different view of the phrase "+/- 10% shipping tolerance."

Wilbanks testified:

> Q: What was your understanding [of the plus/minus ten percent shipping tolerance
> phrase]?
> A: That 90 percent of the Tranche, whatever shipment put the contract over 90 percent of
> the Tranche, was when the contract was finished.  So that, you know, XXX any shipment
> that put the contract over XXX tons, to me that is when the contract was over.
> Q: How did that affect the plus ten percent part of the language?
> A: The plus ten percent means that if the shipment size would put it above XXX tons, you
> couldn't do it.  So, anytime that a shipment went between 90 and 110 percent the contract
> was over, the final shipment.

(Pl.'s Mem. at Ex. B, Wilbank Dep. at 68-69.)  Wilbanks testified that he had the same

understanding as to the 2005-2009 Agreement as well.  (*Id.* at 77-79.)  Wilbanks does not

remember negotiating the "shipping tolerance" phrase, nor does he remember communicating his

understanding of the phrase to Papadopoulos.

James, Netzel, Papadopoulos, and Wilbanks are the four persons responsible for

negotiating the 2004, 2005-2009, and previous agreements.  Each of the four testified to having a

different interpretation of the crucial "+/- 10% shipping tolerance" phrase.  While James's

deposition testimony lends significant support to VPEM's view of the contract, his testimony is

not entirely unambiguous.  On the one hand, James indicated that he did not expect the contract

amount could be significantly changed, and he specifically stated that he did not think the

contract amount could be changed due to a shift in the price of coal.  On the other hand, he did

not state that he expected Drummond to deliver the precise amount of coal specified in the contract. He further stated his understanding that the contract was fulfilled if, when all the shipments were summed at the end of the year, the total was within ten percent of the stated contract quantity. Significantly, he was not asked whether the +/- 10% referred specifically to individual shipments, or what a "reasonable tolerance" was.

Though Netzel's view of the Agreement is essentially the view of the Agreement proposed by VPEM in its summary judgment motion, the defendants point out that Netzel also stated, "I think that when you get within plus or minus [10% of] a ship delivering coal within the total contract quantity, it becomes a judgment call between the buyer and seller." (Pl.'s Mem. at Ex. F, Netzel Dep. at 49.) When asked if there were "hard and fast rules on how this works," Netzel responded, "It's– the understanding is it's - it's within a ship" later explaining "if you're a million tons, and you're plus or minus XXX, you're going to bring as many ships as you can until you're close to that million, plus or minus a ship." (*Id.* at 50-51.) Netzel also admitted that he could not remember whether the term "shipping tolerance" came up in the course of the contract negotiations. While Netzel's view of the contract seems to comport most with common sense, it is not clear that he held this belief during the negotiations or communicated it to the defendants.

Papadopoulos and Wilbanks hold different positions on the meaning of the phrase than do James and Netzel. Papadopoulos believed that USGen had the right to demand an amount that was between 90% and 110% of the total contract quantity. This is a different position than the one taken by Netzel, who did not believe that the +/- 10% shipping tolerance created a buyer's option. Wilbanks testified that the contract was satisfied when between 90 and 110 percent of the stated contract was shipped. In effect, Wilbanks testified that the phrase created a seller's option.

While on balance the intent of the drafters tends to validate VPEM's position on the meaning of the phrase, given the various interpretations expressed by the drafters, the intent of the parties is susceptible to two reasonable interpretations and is not a sufficient basis to grant plaintiff's motion.

### C.  Parties' Course of Dealing and Past Performance

As noted above, the parties entered into coal purchase agreements in two years prior to the Agreements at issue here.  The 2002 Agreement was similar in most ways to the 2004 and 2005-2009 Agreements, but contained this material difference:

**Contract Quantity**: XXX Tons +/- 10%, Buyer's option in two (2) shipments

While the 2002 Agreement, of course, does not include the crucial "+/- 10% shipping tolerance" phrase, it does indicate that the parties knew how to include an explicit option for the buyer.  Accordingly, the phrase "+/- 10% shipping tolerance" should not be read to create a buyer's option, because the 2002 Agreement demonstrates that the parties knew how to write a buyer's option into the contract had they chosen to do so.

The 2003 Agreement did include the "+/- 10% shipping tolerance" phrase.  While Wilbanks and Papadopoulos apparently disagreed about what that phrase meant in the 2003 Agreement, VPEM points out that, under that Agreement, Interocean shipped almost precisely the exact tonnage specified under the contract.  (*See* Pl.'s Mem. at Ex. C, Walker Decl. at ¶¶ 4-6.) Similarly, Tranche II of the 2004 Agreement was performed to almost exactly the specified tonnage.  (*See Id.* at Ex. E, Walker Dep. at 40-41.)  VPEM thus contends that the past Agreements containing the "+/- 10% shipping tolerance" phrase were understood by the defendants to obligate them to ship close to the specified tonnage.

12

VPEM relies on email correspondence to establish that Interocean believed the contract would only be fulfilled if the specified quantity was shipped.  For instance, for shipments under the 2004 Agreement, on October 17, 2004, James wrote to Netzel that Interocean shipped within "less than 2%" – or XXX net tons – of the stated contract quantity, "which fulfills the requirements of the contract for 2004."  (Pl.'s Mem. at Ex. D, Ex. 7.)  VPEM also notes that because Interocean had shipped only XXX tons by the end of year 2004, it told VPEM that approximately XXX tons would be carried over to 2005.  (*Id.* at Ex. 13.)  Further, on October 17, 2004, James provided a proposed shipping schedule for 2005, which would "provide the XXX metric tons required by contract."  (*Id.* at Ex. 7.)  VPEM took James's correspondence to mean that the defendants would deliver the tonnage specified in the contract.  (Pl.'s Mem. at 19.)

The defendants, however, contend that the course of dealing establishes that the parties never applied a +/- 10% shipping tolerance limit to individual shipments under the Agreements. Indeed, in their testimony Wetzel and Walker testified that the limitations placed on shipments were practical considerations of space and shipping conditions, and not with reference to +/- 10% of any individual shipment.  While the 2004 Agreement provided that the individual shipments were to be pro rata (or approximately 50,000 tons per shipment), the shipments to VPEM frequently varied by far more than +/- 10% of that 50,000 ton goal because of the restrictions placed on ships by the ports.  (*See* Def.'s Opp Mem. at Ex. 6, Walker Dep. at 44-45.)  In the second half of 2004, for instance, shipments exceeded 60,000 tons.  (*Id.* at 51-53.)  The defendants argue that VPEM can not claim the "+/- 10% shipping tolerance" referred to individual shipments because VPEM accepted these shipments without complaint.

VPEM further argues that representatives of USGen and VPEM performed consistently

13

with their interpretation of the Agreements, and understood the term "shipping tolerance" to refer to a tolerance of each individual shipment.  Diana Walker, principal vessel scheduler for some of the facilities for USGen and VPEM, testified that a contract amount can never be shipped exactly to a specified quantity, because of the vagaries of ships' design and shipping conditions, making a shipping tolerance necessary.  (*Id*. at 26-27.)  Greg Wetzel, senior fuel trader for VPEM, was responsible for inventory planning for some of the plants receiving coal from the defendants. Wetzel testified that his understanding of "shipping tolerance" relates to the particular vessel and shipment and is intended to allow the vessel captain to load the ship as fully as conditions allow within the +/- 10% range.  Wetzel states that "Drummond owed us XXX tons, and plus or minus 10% would take place on an individual shipment basis."  (*Id.* at Ex. 9, Wetzel Dep. at 113.) VPEM also notes that Karla Haislip, the overseer of all fuel consumed by Dominion companies, shared the view of others at VPEM.  Haislip testified that "I believe it is very, very clear.  That a shipping tolerance is each shipment can vary plus or minus ten percent."  (*Id.* at Ex. 1, Haislip Dep. at 71.)

The defendants argue that, despite their testimony at deposition, nobody at USGen or VPEM gave the "+/- 10% shipping tolerance" consideration until this dispute arose.  (Def.'s Opp. Mem. at 13.)  As noted above, Netzel did not discuss the term at all during 2004.  (Netzel Dep. at 72-73.)  Similarly, Haislip said she never considered the term until February 2005, Wetzel only understood the meaning of the term when he did internet research in 2005, and Walker did not have occasion to refer to the term until the fourth quarter of 2004.  Thus, the defendants argue, despite the unified front VPEM's employees currently show, the plaintiff (and the defendants) had no firm view of the phrase as most of the 2004 Agreement was being fulfilled.

14

Like the intent of the parties, the course of dealing tends to support VPEM's view of the contract, but the defendants provided sufficient evidence to raise a dispute of material fact. While the defendants performed to near-specifications in 2003 and Tranche II of the 2004 Agreement, VPEM also accepted individual shipments in 2004 that were outside a 10% range per shipment. Further, VPEM's witnesses testified that they did not consider the meaning of the shipping tolerance phrase until a problem arose. Accordingly, the course of dealing does not unambiguously establish that VPEM's view of the Agreements is correct.

### D.  Trade Usage

To buttress its argument, VPEM also proffered opinions from two people with expertise in the industry. One of those experts, Mr. Vismas, has worked in the coal industry for fifty years and served as President of Exports for America's largest coal producer, Pittston Coal. In his prepared report, Vismas wrote:

> "What does "+/- 10% shipping tolerance" mean? ...
>
> It is my experience that the "shipping tolerance" cannot be arbitrarily applied to the total contract quantity, and certainly not if that is done because the sales price is no longer in line with prices in a rising market.
>
> The shipping tolerance applies to the tonnage a vessel expects to load. In a contract with a large tonnage for which many different vessels are placed, one cannot lose sight of this fact. The tolerance must be applied from vessel to vessel and when the tonnage is totaled, it should come as close as possible to the contracted quantity.

(Pl.'s Mem. at Ex. J, Vismas Report at 4.)

Vismas explained that the phrase "+/- 10% shipping tolerance" is typically located next to the quantity provision because it relates to the quantity of coal shipped  (*Id.* at 144-45) and that "plus or minus shipping tolerance means the vessel can load plus or minus 10% depending on the

circumstance when the loading takes place." (*Id.* at Ex. K, Vismas Dep. at 93.)  Vismas stated

that to the extent there are multi-year agreements, any amount that deviates from the contracted

amount is typically applied to the next year of the agreement.  ( *Id.* at 131-32.)  Vismas declared

that "this is the first time I say that I have seen somebody who declares tonnage not even

delivered yet, oh, we are going to ship 10 percent less." (*Id.* at 73.)

 The defendants pointed out several reasons to question Vismas's testimony.  For instance,

Vismas did not review the 2002 or 2003 Agreements, though he admitted that reviewing prior

agreements might have affected his opinion in this case.  (Def.'s Opp. Mem. at Ex. 13, Vismas

Dep. at 48.)  Even with his vast experience in the field, Vismas was not sure whether he had ever

encountered the "+/- 10% shipping tolerance" phrase in the past, and he testified that "shipping

tolerance" is not a phrase widely used in the industry.  (*Id.* at 73-74, 137-38.)  Vismas also stated

that the parties should come as close as possible to the contracted quantity, though he was not

able to specify how close was close enough, merely leaving it to the buyer to determine how

"close" is "as close as possible." (*Id.* at 124-25.)

 VPEM's rebuttal expert was Donald Frost.  Frost spent forty years in the shipping

industry, where he shipped dry bulk commodities, including coal.  (Pl.'s Mem. at Ex. L, Frost

Report at 1.)  Frost explained that "shipping tolerance" has an accepted meaning in the shipping

industry.  Like others of VPEM's witnesses, Frost explained that the function of the shipping

tolerance is to account for "the normal variables of cargo quantity imposed by different ships

performing over the contract period ..." (*Id.* at 7.)  Frost also explained how these contracts play

out in practice:

> And so the 10% more or less is a cumulative thing at the end of the contract.  It's 10% for
> each vessel.  But like I said, what wasn't stated is well, how do I know when I've gotten

up to the maximum cargo.  Well, your maximum tonnage should be to the nearest full
cargo.  Not stated, but that's what should have been stated.

(*Id.* at Ex. M, Frost Dep. at 82.)  Thus, Frost generally backs up VPEM's theory that the shipping

tolerance phrase referred to individual shipments and that the contract should be filled to the

nearest ship.  The defendants note that Frost has no experience with these parties and Frost's

opinion comes only from a "simple reading" of the language in the contract.

The defendants offered Frederick Gordon as their expert in the industry.  Gordon has

twenty-five years of experience in the overseas shipment of bulk energy products, including coal,

though VPEM argues that Gordon has not been involved in such transactions since 1986.  (Pl.'s

Mem. at Ex. N, Gordon Rep. at 1.)  Gordon testified:

> The term "shipping tolerance" does not have a recognized industry or trade usage.  It can
> mean different things in different contexts.  In this context, it clearly does not apply to
> individual coal shipments.  If it applied to individual shipments, the Agreements would so
> state and they would necessarily supply additional instruction to that end.  They do not.
>
> By contrast, the term "MOLOO" (an acronym for "More or Less at Owner's Option"), is a
> term traditionally used to indicate that each individual shipment may vary depending on
> actual vessel conditions. "MOLOO" is a commonly used bulk shipping term with a
> uniformly understood trade or industry meaning.  Other recognized trade terms conveying
> this concept, although less common, are "min/max" and "MOLCHOP" (an acronym for
> "More or Less Charterer's Option").  That none of these terms appears in either of the
> Agreements is significant, and their absence suggests that the parties in fact did not intend
> the "+/- 10%" variance to apply to individual shipments.

(*Id*. at 2.)  Gordon, thus, believes there are other terms that are usually used (e.g. MOLOO) to

alter individual shipments.  Here, because those terms were not used, and because shipping

tolerance has no fixed meaning, he does not believe that "+/- 10% shipping tolerance" was meant

to refer to individual shipments.  Gordon ultimately believes that Interocean was only obligated to

ship 90% of the stated quantity under the Agreements.  (*Id.* at Ex. O, Gordon Dep. at 60.)

17

VPEM of course, challenges Gordon's opinion.  It notes Gordon's statement that because the "shipping tolerance" phrase has no fixed meaning, it could be taken out of the contract without altering the meaning of the contract.  (*Id*. at 64.)  VPEM also notes that Gordon believes the "+/- 10% phrase" should be read to mean only "-10%" because shippers typically do not ship more than the stated quantity.  (*Id*. at 74-75.)  VPEM argues that Gordon (like plaintiff's experts) did not examine the course of dealing between the parties, so is not able to put the Agreement in context.

After consideration of the experts' opinions, a dispute of material fact remains.  The experts appear to agree that "+/- 10% shipping tolerance" is not a commonly used phrase in coal shipments.  VPEM's experts claim that "+/- 10% shipping tolerance" is equivalent to the phrase "MOLOO," cited by Gordon, and that shipping tolerances apply to individual shipments.  The defendants' expert claims that the "+/- 10% shipping tolerance" phrase has no defined meaning, and that if the parties wanted the Agreement to have a MOLOO clause, they would have explicitly included it.  Both arguments are plausible, and while VPEM's experts solidly support the plaintiff's view of the contract, the defendants' expert testimony is enough to create a material dispute of fact.  Accordingly, VPEM's motion for summary judgment must be denied.

### III.  Defendants' Motion for Partial Summary Judgment

In order to close the gap left by the defendants' failure to complete the coal contract in 2004 and 2005, VPEM "covered" by making purchases on the spot market.  The defendants contend that none of the several 2005 spot coal purchases that VPEM identified as "cover" were properly made under the 2004 Agreement, and any entitlement to cover damages should be limited to spot coal purchases made after September 15, 2005, for two reasons.  First, according

18

to the defendants, Section 11 of the 2004 Agreement provides that if one party considers the other to be in default, the non-defaulting party must given written notice to the defaulting party and give that party five days in which to cure the default.[3]   The defendants also cite the UCC, which has been interpreted to state that cover is available only after the buyer has given the seller due notice of the breach.[4]   *See, e.g., Medinol Ltd. v. Boston Scientific Corp.*, 346 F. Supp. 2d 575, 595 (S.D.N.Y. 2004).   The defendants argue they were not given notice until September 15, 2005, through a Notice written by Karla Haislip informing them that, pursuant to Section 11 of the Agreement, they were considered by VPEM to be in breach.   (Def.'s Mem. at Ex. D.)   The defendants thus argue that any "cover" purchases made before September 15 are not allowed under the contract.

Second, the defendants argue that because VPEM makes spot transactions on the market on a regular basis, it is impossible to identify the specific transactions intended to cover the defendants' breach.   (Def.'s Mem. at 2-4.)   The defendants point to Haislip's statement that: "I would say that anything we purchased on the spot as a single cargo basis regardless of whether

---

[3]Section 11 of the 2004 Agreement provides:

An "Event of Default" shall mean with respect to a party ("Defaulting Party"): (i) the failure by the Default Party to make, when due, any payment required pursuant to this Agreement if such failure is not remedied within three (3) Business Days after written notice of such failure is given to the Defaulting Party by the other party ("Non-Defaulting Party") ...; (iv) the failure by the Defaulting Party to perform any covenant set forth in this Agreement (other than the events that are otherwise specifically covered in this section as a separate Event of Default or its obligations to deliver or receive Coal a remedy for which is provided in <u>Liquidated Damages</u>), and such failure is not excused by Force Majeure or cured within five (5) Business Days after written notice thereof to the Defaulting Party.

 (Am. Compl. at Ex. A) (Emphasis in original).

[4] The parties agree that New York U.C.C. law governs the contract.

we knew that they [Interocean] were going to deliver or not we were using to cover coal that did

not show up in 2004."  (Def.'s Mem. at Ex. C, Haislip Dep. at 116-17.)

      VPEM argues that the liquidated damages clause of Section 9 provides for the right to

cover without notice being given.[5]  As both parties note, however, Section 9's provisions apply to

the failure to deliver "pre-paid quantities of coal."  The record before us does not clearly establish

that VPEM made more than one prepayment for coal.  Even if Section 11 applies, however, a

genuine dispute of material fact exists as to when and whether notice was given that VPEM

considered the defendants to be in breach.  VPEM claims that after the defendants stated in

January 2005 that they would provide no more coal under the 2004 Agreement, VPEM

representatives continued to seek full performance of the contract.  VPEM argues that these

communications constituted notice that it considered the defendants to be in breach of the 2004

contract.  (*See, e.g.,* Pl.'s Opp. Mem. at Ex. E.)  Because the underlying question of whether the

contract was breached at all must be tried, the subsidiary question of cover damages is best left

for resolution at the same time.

A separate order follows.

---

[5] Section 9 specifically provides:
"(b) ... (iii) in the event of <u>unexcused</u> failure to deliver, damages, if any, equal to the
difference, if any, between the Price that Buyer purchases an equivalent quantity of Coal
(using commercially reasonable standards) from a third party seller plus reasonable Costs
incurred, including if any, any additional vessel costs and expenses minus the Price
agreed to by the parties for that Shipment of Coal."
(Am. Compl. at Ex. A) (Emphasis in original).

__February 22, 2007__          _____/s/_____
Date                          Catherine C. Blake
                              United States District Judge